# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| UNITED STATES OF AMERICA | CRIMINAL ACTION |
|---|---|
| VERSUS | NO. 17-225 |
| RONALD THOMPSON | SECTION: "E" (2) |

## ORDER AND REASONS

On November 30, 2017, the grand jury charged Defendant Ronald Thompson, Jr. with three counts of possession with the intent to distribute cocaine, cocaine base, and heroin.[1] Before the Court is Defendant's Motion to Suppress.[2] The motion is opposed.[3] Defendant filed a reply memorandum.[4] Defendant has not requested an evidentiary hearing.[5] For the reasons that follow, Defendant's Motion to Suppress is **DENIED**.

## FACTUAL BACKGROUND[6]

On July 28, 2017, members of the St. Charles Parish Sheriff's Office's Special Investigations Division conducted surveillance operations near Birdie's Food and Fuel Gas Station in Luling, Louisiana, an area known for illegal drug activity.[7] At approximately 4:15 p.m., Officer Jason Tiliakos observed a black Infiniti pull into the

---

[1] R. Doc. 1. *See* 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C) (2012).
[2] R. Doc. 14.
[3] R. Doc. 18.
[4] R. Doc. 28.
[5] An evidentiary hearing is required on a motion to suppress only when necessary to receive evidence on an issue of fact. *United States v. Harrelson*, 705 F.2d 733, 737 (5th Cir. 1983). An evidentiary hearing need not be set as a matter of course, but only if the motion alleges facts that, if proved, would require the grant of relief. *Id.*
[6] The following facts are taken from the Incident Report written by Officer Daniel April of the St. Charles Parish Sheriff's Office, R. Doc. 18-1, and the affidavit of Officer April in support of his application for a warrant to search Thompson's person, R. Doc. 30-4. Defendant does not dispute the facts as described by the Government; rather, Defendant's arguments focus on the sufficiency of these facts to establish reasonable suspicion.
[7] R. Doc. 18-1 at 8.

parking lot of the convenience store.[8] According to the incident report, the investigators were familiar with a vehicle of this description because the Sheriff's Office had received an anonymous tip in February 2017 that Ronald Thompson used a black Infiniti to conduct drug sales.[9]

After a short time, Detective Tiliakos observed a black male, later identified as Emanuel Harris, ride his bicycle up to the Infiniti, put his head through the driver's side window, and appear to converse with the vehicle's occupant.[10] Shortly thereafter, a second man approached the Infiniti and entered the vehicle through the passenger side door.[11] Detective Tiliakos stated that the second man exited the car seconds later, got into a maroon-colored sport-utility vehicle, and left the area.[12] Emanuel Harris also soon departed, riding his bicycle north on Louisiana Highway 52.[13] Detective Tiliakos relayed his observations to Detective Daniel April and Sergeant Brad Walsh of the St. Charles Parish Sheriff's Office as the black Infiniti exited the parking lot.[14]

April and Walsh followed the black Infiniti traveling south on Highway 52, and then onto Old Spanish Trail.[15] The incident report states, "[a]s investigators followed the Infiniti, they observed the vehicle cross the center line of the roadway, which was a two way road, on several occasions."[16] After observing the traffic violation, Detective April and Sergeant Walsh activated their emergency lights and stopped the Infiniti.[17]

---

[8] R. Doc. 18-1 at 8.
[9] *Id.*
[10] *Id.*
[11] *Id.*
[12] *Id.*
[13] *Id.*
[14] *Id.*
[15] *Id.*
[16] *Id.*
[17] *Id.*

The traffic stop began at 4:59 p.m.[18] Detective April approached the driver's side of the vehicle, and the driver identified himself as Ronald Thompson, confirming the anonymous tip to the extent that the tip included the statement that Thompson drove a black Infiniti.[19] Sergeant Walsh approached the passenger's side, and made contact with the passenger, Darryl Bourgeois.[20] Detective April informed Defendant of the traffic violation and asked for Defendant's driver's license and vehicle registration.[21] As Detective April spoke with Defendant, April observed that Defendant was "sweating heavily about the forehead" and "his body was visibly shaking while he produced his driver's license."[22] Defendant also "stuttered while attempting to answer, clearing his throat several times."[23] When Detective April asked where he was driving, Defendant "stated he was just driving around with no known destination."[24]

Detective April conducted a name check on Defendant through law enforcement indices, and learned that Defendant's license was in good standing.[25] Defendant argues that, at this point, the investigation of the traffic violation concluded, and he should have been released.

Rather than concluding the investigation, however, Detective April questioned Defendant further, asking him whether he was nervous. According to the incident report, Defendant said he was nervous because he was on parole for prior narcotics violations.[26] The investigators asked Bourgeois to exit the vehicle, and when asked, Bourgeois told

---

[18] *See* Call for Service Report, R. Doc 18-2.
[19] R. Doc. 18-1 at 9.
[20] *Id.*
[21] *Id.*
[22] *Id.*
[23] *Id.*
[24] *Id.*
[25] *Id.*
[26] *Id.* In Defendant's reply brief, he elaborates that he was charged with resisting arrest in 1997.

Walsh that Defendant was taking him to Des Allemands, Louisiana.[27] Bourgeois stated he did not know why Defendant was unable to provide the same answer.[28]

At roughly 5:05 p.m., based on the information collected through the surveillance at the gas station, the fact that the area is known for drug activity, the February 2017 anonymous tip, the confirmation of Defendant's identity as Ronald Thompson, and Defendant's nervous behavior during the stop, April and Walsh allege they developed a reasonable suspicion that Defendant was involved in drug activity, and, based on that reasonable suspicion, they requested assistance from a canine unit.[29] The detectives asked Defendant to exit the vehicle, and, because of his history of resisting officers in the past, he was placed in handcuffs.[30]

At 5:17 p.m., eighteen minutes after Defendant was pulled over, Deputy Deroche arrived with the canine.[31] The canine responded positively to an open-air sniff outside the car.[32] The canine then sniffed the interior of the vehicle, and alerted positively to the center console and the driver's seat, where Defendant had been sitting.[33] Based on the canine search, the officers conducted a warrantless search of the vehicle, finding a wallet with $1,870 in cash and a social security card bearing Defendant's name in the glove box, as well as brass knuckles in the center console.[34]

At that point, the officers placed Defendant in the back seat of the patrol unit.[35] A few minutes later, officers removed Defendant from the patrol car, read him his *Miranda*

---

[27] *Id.*
[28] *Id.*
[29] R. Doc. 18-1 at 9.
[30] R. Doc. 18-1 at 9.
[31] *See* R. Doc. 18-2.
[32] R. Doc. 18-1 at 9. Exterior Video at 10:18.
[33] R. Doc. 18-1 at 9. Exterior Video at 13:21.
[34] *Id.*
[35] *Id.*

rights, and asked for consent to search his person.[36] Defendant initially consented to the search, but then revoked his consent.[37] The officers then placed Defendant back into the patrol vehicle while they secured a warrant to search his person.[38] Video from the interior of the vehicle shows that, after he was returned to the patrol car, Defendant reached his handcuffed right hand into his pants, and then moved his hand, balled into a fist, into the seatback behind him.[39] The video does not show what was in Defendant's fist.

After receiving the warrant to search Defendant, Detectives April and Tennison removed him from the police car, and Detective Tennison searched the back seat.[40] Tennison found a bag of drugs containing roughly 28 grams of cocaine, rock-like substances that tested positive for cocaine, 34 tablets that tested positive for ecstasy, and nine bundles that tested positive for about 2 grams of heroin.[41] Defendant was then placed under arrest.[42] During a search of Defendant's person pursuant to the search warrant, $400 was found in his pants pocket.[43]

On November 30, 2017, the grand jury returned a three-count indictment alleging Defendant (1) possessed with the intent to distribute a quantity of cocaine, (2) possessed with the intent to distribute a quantity of cocaine base, and (3) possessed with the intent to distribute a quantity of heroin, all in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C).[44]

---

[36] R. Doc. 18-1 at 9; Interior Video at 29:27; Exterior Video at 29:27.
[37] R. Doc. 18-1 at 10.
[38] Interior Video at 33:00.
[39] Interior Video at 33:30.
[40] Interior Video at 1:26:50.
[41] R. Doc. 18-1 at 10-11.
[42] *Id.* at 11.
[43] *Id.* at 10.
[44] R. Doc. 1.

Defendant now moves to suppress any and all evidence obtained after Detective April verified that Defendant's driver's license was in good standing as the fruits of an unconstitutional search and seizure, including (1) the $1,870 in cash and the brass knuckles found during the search of his vehicle, (2) the drugs found in the police vehicle, and (3) the $400 in cash found on his person pursuant to the search warrant.[45] Defendant contends that the initial investigatory stop of Defendant's vehicle was justified only by the alleged traffic violation, and as a result, the stop should have concluded after Detective April verified that Defendant's license was in good standing. Defendant argues that by continuing to detain and question him, requesting a canine unit, and searching his vehicle, the officers extended the detention beyond the scope of the initial investigation, violating the Fourth Amendment. Any and all evidence obtained as a result of the detention, Defendant asserts, should be excluded from trial.[46]

The Government asserts that the facts available to the officers at the time they continued to detain him—including (1) the anonymous tip regarding Defendant using a black Infiniti for drug transactions, (2) Detective Tiliakos' surveillance of suspicious activity surrounding the Infiniti in the parking lot, (3) the fact that the area is known for drug activity, (4) the confirmation of Defendant's identity as Ronald Thompson, and (5) the Defendant's nervousness during the traffic stop—are sufficient to establish reasonable

---

[45] R. Doc. 14. Defendant is not entirely clear as to what specific evidence he seeks to have suppressed. The motion states, "Mr. Thompson moves to suppress the evidence seized on July 27, 2018 [sic] as well as any statements or other evidence discovered as a result of the unconstitutional activity." The Court interprets the motion to seek suppression of the physical evidence obtained during and after the traffic stop, as well as any statements made by the Defendant, Mr. Bourgeois, or any other person, whether such statements are specifically identified in the motion or not.

[46] The Court acknowledges that, even if the evidence in this case were discovered as the result of an unconstitutional detention, some evidence may nevertheless be admissible if the discovery of the evidence is sufficiently attenuated from the constitutional violation. *See Utah v. Strieff*, 136 S. Ct. 2056, 2061-62 (2016). The Court need not decide this issue, however, because it finds that the continued detention of the Defendant was supported by reasonable suspicion.

suspicion of criminal activity, justifying a prolonged detention sufficient to call for the assistance of the canine unit.[47] The Government argues that because the additional investigation was justified, the evidence obtained as a result of the canine sniff, the search of Defendant's vehicle, and the search of the police vehicle, should not be suppressed.

## **LEGAL STANDARD**

The Fourth Amendment expressly imposes two requirements: (1) all searches and seizures must be reasonable, and (2) "[a] warrant may not be issued unless probable cause is properly established and the scope of the authorized search is set out with particularity."[48] "Warrantless searches are presumptively unreasonable."[49] The exclusionary rule forbids the use of evidence obtained in violation of the Fourth Amendment.[50] The rule prohibits such use "not because the evidence is not probative, or to chastise errant law officers or to benefit the accused, but to compel respect for the guaranty of the Fourth Amendment 'in the only effectively available way—by removing the incentive to disregard it.'"[51] Accordingly, "where suppression fails to yield 'appreciable deterrence,' exclusion is 'clearly . . . unwarranted.'"[52]

As a general rule, the proponent of a motion to suppress must prove by a preponderance of the evidence that the evidence in question was obtained in violation of his or her Fourth Amendment rights.[53] In the case of a warrantless search of a car, the

---

[47] R. Doc. 18 at 5-10.
[48] *Kentucky v. King*, 563 U.S. 452, 459 (2011).
[49] *United States v. Villarreal*, 963 F.2d 770, 773 (5th Cir. 1992).
[50] *United States v. Otero*, 176 F.3d 479 (5th Cir. 1999) (per curiam).
[51] *United States v. Ragsdale*, 470 F.2d 24, 30 (5th Cir. 1972) (quoting *Elkins v. United States*, 364 U.S. 206, 217 (1960)).
[52] *Davis v. United States*, 564 U.S. 229, 237 (2011) (alteration in original) (quoting *United States v. Janis*, 428 U.S. 433, 454 (1976)).
[53] *United States v. Iraheta*, 764 F.3d 455, 460 (5th Cir. 2014).

burden shifts to the Government to prove by a preponderance of the evidence that its actions were constitutional.[54]

## **ANALYSIS**

The stop of a vehicle and detention of its occupants constitutes a "seizure" under the Fourth Amendment.[55] The legality of a traffic stop is analyzed under the two-part test set forth in *Terry v. Ohio*.[56] First, the Court inquires whether the traffic stop was justified at its inception.[57] If so, the Court next inquires "whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop."[58]

Regarding the first prong, a traffic stop is justified at its inception when an officer has reasonable suspicion that a traffic violation occurred or is about to occur.[59] Detective April observed Defendant's vehicle cross the center line several times—a clear traffic violation. Accordingly, the constitutionality of this traffic stop turns on the second prong of the *Terry* test.

Once lawfully stopped, the detention must last no longer than necessary to effectuate the purpose of the stop.[60] During this time, an officer may order the occupants out of the car,[61] ask the occupants for identification and run a computer check for outstanding warrants,[62] and engage in "wide-ranging" questioning unrelated to the

---

[54] *United States v. Guerrero-Barajas*, 240 F.3d 428, 432 (5th Cir. 2001).
[55] *See United States v. Raney*, 633 F.3d 385, 389 (5th Cir. 2011).
[56] 392 U.S. 1 (1968); *see also United States v. Jenson*, 462 F.3d 399, 403 (5th Cir. 2006) ("We analyze the validity of traffic stops under *Terry* . . . .").
[57] *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004) (en banc).
[58] *Id.*
[59] *See United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005). "An officer may stop a motorist for a traffic violation even if, subjectively, the officer's true motive is to investigate unrelated criminal offenses." *United States v. Sanchez-Pena*, 336 F.3d 431, 437 (5th Cir. 2003).
[60] *Brigham*, 382 F.3d at 507.
[61] *Maryland v. Wilson*, 419 U.S. 408, 414–15 (1997).
[62] *United States v. Pack*, 612 F.3d 341, 350–51 (5th Cir. 2010).

purpose of the traffic stop.[63] As a general rule, if all computer checks come back clean, any questioning must stop, and the driver and passengers must be released.[64] If, however, additional reasonable suspicion arises before the initial purpose of the stop has been fulfilled, the detention may continue until the new reasonable suspicion has been dispelled or confirmed.[65] In determining whether reasonable suspicion develops, a court "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing."[66]

## I. Reasonable Suspicion to Prolong the Detention

The Government asserts that Detective April and Sergeant Walsh had reasonable suspicion to prolong Defendant's detention based on several factors: (1) Detective Tiliakos' observations of suspected drug activity, (2) the fact that the activity took place in an area known for drug crime, (3) the anonymous tip regarding Defendant's use of a black Infiniti to conduct drug transactions, (4) the confirmation of Defendant as Ronald Thompson, and (5) the Defendant's nervousness during the initial traffic stop. The Government also asserts that Defendant and Bourgeois' inconsistent statements regarding the purpose of the trip heightened the officers' suspicion. However, Sergeant Walsh did not question Bourgeois until after Defendant's license was verified, and therefore the inconsistency cannot be used to justify the continued stop.[67]

---

[63] *See Lopez-Moreno*, 420 F.3d at 430–31. "This is because detention, not questioning, is the evil at which *Terry*'s second prong is aimed." *United States v. Macias*, 658 F.3d 509, 517 (5th Cir. 2011) (internal quotation marks omitted).
[64] *United States v. Jenson*, 462 F.3d 399, 404 (5th Cir. 2006).
[65] *Lopez-Moreno*, 420 F.3d at 431.
[66] *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)).
[67] *See United States v. Espinoza-Seanez*, 862 F.2d 526, 533 (5th Cir. 1988) (explaining that information gathered after a stop cannot be used to justify the stop).

9

The Court evaluates each of these factors in order to determine whether, in the aggregate, they establish reasonable suspicion to extend the *Terry* stop.

A.  Surveillance of Defendant's Vehicle in Area Known for Drug Activity

While parked in an unmarked vehicle near Birdie's Food and Fuel Gas Station, Detective Jason Tiliakos observed Defendant's Black Infiniti pull into the gas station parking lot.[68] Tiliakos observed several people visit Defendant's vehicle. First, Emanuel Harris approached the driver's side of the car, "put his head through the driver's side front window," and appeared to talk with the occupants of the car. Soon thereafter, a second unidentified male entered Defendant's vehicle through the driver's side front door, only to exit "seconds later."[69] This unidentified male subsequently got into a different vehicle, and left the area.[70]

According to the incident report, "based on training, professional experience and knowledge, investigators knew that individuals who meet with individuals for very short periods of time and/or enter parked vehicles in parking lots is consistent with how individuals involved in illicit drug activity commonly facility drug transactions."[71] The Court "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them,"[72] giving these inferences "due weight."[73]

Further, the officers knew from experience that the parking lot of the gas station and the street adjacent to it are "known haven[s] for criminal, specifically narcotics,

---

[68] R. Doc. 18-1 at 8.
[69] R. Doc. 18-1 at 8.
[70] *Id.*
[71] *Id.*
[72] *United States v. Arvizu*, 534 U.S. 266, 273 (2002).
[73] *Ornelas v. United States*, 517 U.S. 690, 699-700 (1996).

activity."[74] The incident report states that surveillance and undercover operations conducted at this gas station have led to drug arrests in the past.[75] Of course, a defendant's presence in a high-crime area, without more, is not sufficient to establish reasonable suspicion.[76] The Fifth Circuit has found, however, that being in an area known for criminal activity may be one factor in the totality-of-the-circumstances analysis.[77] For example, in *United States v. Wilson*, the court found reasonable suspicion for a *Terry* Stop where:

> The officers, who were hired to secure a private parking lot located in a high-crime area, observed Wilson walking in between the parked cars at night concealing something beneath his shirt. Upon noticing the police, Wilson nervously attempted to evade them. These facts objectively gave the officers reasonable suspicion sufficient to effectuate a constitutional stop.

In this case, Detective Tiliakos observed Defendant engage in several short interactions, in which people rapidly enter and exit his vehicle, in area known to law enforcement as a high-drug-crime area.

B.     Anonymous Tip

Defendant argues the February 2017 anonymous tip that "Ronald Thompson was utilizing a black Infiniti while distributing quantities of illicit narcotics" is insufficiently reliable to establish reasonable suspicion to justify the prolonged detention. Defendant questions whether the anonymous tip even exists, arguing that the St. Charles Parish Sheriff's Office has not provided the name, address, or telephone number of the tipster.[78]

The Fifth Circuit evaluates whether an informant's tip provides reasonable suspicion based on several factors, including:

---

[74] R. Doc. 18-1 at 8.
[75] *Id.*
[76] *Illinois v. Wardlaw*, 528 U.S. 119, 124 (2000).
[77] See, e.g., *United States v. Wilson*, 342 Fed. App'x 46 (5th Cir. 2009).
[78] R. Doc. 14-2 at 7.

the credibility and reliability of the informant, the specificity of the information contained in the tip or report, the extent to which the information in the tip or report can be verified by officers in the field, and whether the tip or report concerns active or recent activity, or has instead gone stale.[79]

When the identity of an informant is known, her reputation can be assessed, and she can be held responsible if her allegations turn out to be fabricated. In cases involving anonymous sources, on the other hand, the tip alone "seldom demonstrates the informant's basis of knowledge or veracity about the suspect's involvement in criminal behavior."[80] Accordingly, the United States Supreme Court views anonymous informants with "strong distrust."[81] Nevertheless, "there are situations in which an anonymous tip, suitably corroborated, exhibits sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop."[82]

In *United States v. Martinez*, the Fifth Circuit found that an anonymous tip that the defendant had witnessed a violent crime and might possess the weapons used in the crime was not sufficiently credible or reliable to establish reasonable suspicion to stop the defendant.[83] As in this case, the government had offered no evidence demonstrating the credibility or reliability of the tipster, so the court had look to other facts to evaluate the tip. Although the tip alleged that the defendant was storing weapons used in a crime, the only *verified* information that the police had at the time of the stop was the name of the defendant and his location. "Notably absent . . . [was] any verified information that

---

[79] *United States v. Martinez*, 486 F.3d 855, 861 (5th Cir. 2007).
[80] *Id.* (citing *Florida v. J.L.*, 529 U.S. 266, 270 (2000)).
[81] *Florida v. J.L.*, 529 U.S. 266, 270 (2000).
[82] *Martinez*, 486 F.3d at 864 (quoting *Florida v. J.L.*, 529 U.S. 266, 270 (2000)).
[83] *Martinez*, 486 F.3d at 861-64.

'criminal activity may be afoot.'"[84] As a result, the court found the tip, on its own, did not establish reasonable suspicion.

In this case, however, the police had additional information that verified the allegations of criminal activity in the anonymous tip. According to Detective April's incident report, the tipster indicated that "Ronald Thompson was utilizing a black Infiniti while distributing quantities of illicit narcotics."[85] During the traffic stop, Detective April verified that the driver of the black Infiniti, observed in an area known for illegal activity, was indeed Ronald Thompson. The substance of the tip was further corroborated by Detective Tikiatos' surveillance of Defendant's vehicle, in which the driver engaged in activity indicative of drug transactions. Therefore, unlike in *Martinez*, Detective April and Sergeant Walsh had "corroboration of the illegal activity itself" at the time of the stop.[86] In any event, the officers did not rely solely on the tip. The tip is only one of the factors informing the officers' suspicion.

C. <u>Nervousness</u>

During the lawful investigation of the traffic violation, Detective April observed Defendant "sweating heavily about the forehead" and "visibly shaking while he produced his driver's license."[87] Defendant argues that nervous behavior, in and of itself, does not establish reasonable suspicion, relying on *United States v. Santiago*.[88] In that case, an officer stopped the defendant for a violation of state traffic laws, but detained the defendant and his family based solely on the defendant's "nervousness and conflicting

---

[84] *Id.* at 862 (quoting *United States v. Jaquez*, 421 F.3d 338, 340-41 (5th Cir. 2005)
[85] R. Doc. 18-1 at 8.
[86] *Martinez*, 486 F.3d at 855.
[87] R. Doc. 18-1 at 8.
[88] R. Doc. 1402 at 6. *United States v. Santiago*, 310 F.3d 336 (2002).

13

statements."[89] After receiving consent to search the defendant's automobile, the officer found evidence of drug trafficking.[90] The district court denied the defendant's motion to suppress, and the Fifth Circuit reversed, finding that the initial justification for the stop was satisfied when the officer ran the computer check. "At that point, there was no reasonable or articulable suspicion that Santiago was trafficking in drugs . . . and the extended detention violated Santiago's Fourth Amendment rights."[91]

Defendant's faith in *Santiago* is misplaced. In that case, the officer's suspicion of drug activity was not based on articulable facts *other than* the defendant's nervousness. The facts of this case are more closely analogous to *United States v. Wallstrum*.[92] In that case, the officer suspected one of the defendants was engaged in drug trafficking because the defendant "exhibited extreme nervousness" and was traveling in tandem with other cars, which is common in drug trafficking.[93] The officer also noted receipts and food and drink containers that contradicted the defendant's explanation of his trip.[94] The court ultimately found, "[b]ased on the totality of these facts," that reasonable suspicion was justified.[95] In this case, as in *Wallstrum*, Detective April and Sergeant Walsh's suspicions were supported by other information, including the anonymous tip and the officers' observations of possible drug transactions at the gas station.

## **CONCLUSION**

"Any analysis of reasonable suspicion is necessarily fact-specific, and factors which by themselves may appear innocent, may in the aggregate rise to the level of reasonable

---

[89] *Id.* at 342.
[90] The Fifth Circuit ultimately found the consent invalid. *Id.* at 343.
[91] *Id.* at 342.
[92] 515 Fed. App'x 343, 350-51 (5th Cir. 2013).
[93] *Id.* at 350.
[94] *Id.*
[95] *Id.* at 351.

suspicion."[96] The Court concludes that, in the aggregate, the information known to the officers at the time Detective April verified Defendant's driver's license established a reasonable suspicion that Defendant was participating in illegal drug activity sufficient to justify continued detention to request a canine team. The Fifth Circuit has held that a prolonged traffic stop is constitutional so long as:

> (1) the facts that emerge during the police officer's investigation of the original offense create reasonable suspicion that additional criminal activity warranting additional present investigation is afoot, (2) the length of the entire detention is reasonable in light of the suspicious facts, and (3) the scope of the additional investigation is reasonable in light of the suspicious facts, meaning that it is reasonable to believe that each crime investigated, if established, would likely explain the suspicious facts that gave rise to the reasonable suspicion of criminal activity.[97]

The Court further finds that in light of the officers' suspicion of criminal activity, the length of the detention was reasonable. Exterior video of the stop shows that the canine team arrived 18 minutes after the stop began.[98] The Fifth Circuit routinely upholds delays longer than the delay experienced by Defendant as constitutionally permissible when supported by reasonable suspicion.[99] As a result, the duration of the detention in this case was not unreasonable. Moreover, the scope of the additional investigation was reasonable in light of the additional facts. It is well established that officers may order a canine unit under reasonable suspicion that the subject of the traffic stop is involved in drug activity.[100]

---

[96] *United States v. Ibarra-Sanchez*, 199 F.3d 753, 759 (5th Cir. 1999).
[97] *United States v. Pack*, 612 F.3d 341, 358 (5th Cir. 2010).
[98] R. Doc. 18, Exhibit D, at
[99] *United States v. Escamilla*, 852 F.3d 474, 482 (5th Cir. 2017) (upholding a twenty-four minute investigatory stop); *United States v. Galindo*, 447 Fed. App'x 633, 636 (5th Cir. 2011) (upholding a forty-five minute delay between initial stop and canine unit).
[100] *See, e.g.*, *United States v. Johnson*, 655 Fed App'x 247, 249 (5th Cir. 2016); *See United States v. Andres*, 703, F.3d 828, 833 (5th Cir. 2013) (finding that a police officer acted reasonable when he ordered a canine sniff of the suspect's car after developing reasonable suspicion of drug activity during the stop).

Because the Court finds that the officers had reasonable suspicion that Defendant was engaged in illegal drug activity, Defendant's continued detention was not a violation of the Fourth Amendment. Accordingly, all evidence found after Detective April verified the Defendant's license—including the plastic bag of drugs found in the police cruiser and the evidence found in Defendant's car—were obtained during a constitutionally permissible investigation, and are not "fruits of the poisonous tree."[101]

For the foregoing reasons;

**IT IS ORDERED** that Defendants' motion to suppress is **DENIED**.[102]

**New Orleans, Louisiana, this 12th day of March, 2018.**

_____
**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**

---

[101] *Wong Sun v. United States*, 371 U.S. 471 (1963).
[102] R. Doc. 67.